**WOLF RANCH, LLC, a Colorado limited liability company, Petitioner–Appellant and Cross–Appellee,**

v.

**CITY OF COLORADO SPRINGS, a Colorado home-rule city, Respondent–Appellee and Cross–Appellant.**

No. 07CA2184.

Colorado Court of Appeals, Div. II.

Nov. 13, 2008.

Flynn Wright & Fredman, LLC, Bruce M. Wright, J. Gregory Walta, P.C., J. Gregory Walta, Colorado Springs, CO, for Plaintiff–Appellant and Cross–Appellee.

Patricia K. Kelly, City Attorney, Thomas Marrese, Assistant City Attorney, Colorado Springs, CO, for Defendant–Appellee and Cross–Appellant.

Opinion by Judge CONNELLY.

This case raises issues of first impression under the Regulatory Impairment of Property Rights Act (Act), §§ 29–20–201to –205, C.R.S.2008. The Act enhances constitutional protections against takings of property through certain local land use decisions.

Petitioner, Wolf Ranch, LLC, contends respondent, City of Colorado Springs, violated the Act by refusing to exempt it from drainage fees imposed on land developers. We hold the imposition of these fees is not the type of land use decision that would trigger

the Act. Accordingly, we affirm the judgment denying relief, albeit for reasons different from those relied on by the district court.

## I. Background

Wolf Ranch owns some 1,900 acres of land in Colorado Springs. This land is among the roughly 10,000 acres annexed by the City in the 1982 Briargate agreement.

The Colorado Springs City Council has promulgated ordinances, dating back to the 1960s, regulating drainage and control of flood and surface waters. These ordinances require that drainage basins be established and delineated on a map approved by the Council. The ordinances also require studies to estimate the costs of constructing drainage facilities within each basin.

The ordinances apportion drainage infrastructure costs among all developers within a particular basin. They require the City Council, by resolution, to set a per-acre drainage fee for each basin. This fee is determined by dividing the total number of developable acres into the estimated total costs of the drainage facilities and studies for that basin. Developers are allowed to offset their own drainage infrastructure costs against this fee. Thus, depending on those costs, a particular developer may owe less than the per-acre total, owe nothing at all, or even receive a credit payable from other developers' fees.

Wolf Ranch's land is in the Cottonwood Creek drainage basin. Cottonwood Creek is one of approximately thirty major drainage basins within the City.

In 2005, Wolf Ranch requested to be exempted from the Cottonwood Creek drainage fee, which was then $9,315 per acre. It specifically sought approval to develop some 1,600 of its acres as a "closed basin." Developers of closed basins need not pay drainage fees, and are not entitled to credit for their drainage infrastructure costs.

Wolf Ranch's own calculations estimated that if it were exempted and allowed to develop this acreage as a closed basin, the drainage fees for other developers within Cottonwood Creek would increase by more than $5,000 per acre. Wolf Ranch nonetheless argued it was entitled to an exemption from the fee because its development would not increase and, if anything, would decrease the historical drainage flow outside the development.

In June 2006, the City Drainage Board denied Wolf Ranch's request. Wolf Ranch appealed to the City Council. The Council considered Wolf Ranch's request at two sessions. In September 2006, by a 4–3 vote, it denied the request.

Wolf Ranch filed a Petition for Relief with the district court. The petition asked the court to determine that "the City has failed to meet its burden of proof under C.R.S. § 29–20–204(2)(c) that the imposition of drainage fees on Wolf Ranch is roughly proportional to the impact of the proposed use of Wolf Ranch." Among the relief sought was an "Order that Wolf Ranch shall be exempt from payment of any drainage fees to the City, and shall be developed as a 'Closed Basin.'"

The district court held the decision denying an exemption triggered the Act because it imposed a condition upon the granting of a land-use approval and assessed a fee in an amount determined on an individual and discretionary basis. It ruled the City ordinarily would have to justify the decision by showing the fee was "roughly proportional" to the impact of the proposed development. Ultimately, however, the court declined to decide whether the City could satisfy the rough proportionality standard, and therefore assess the fees without violating the Act, because it concluded Wolf Ranch had not adequately preserved the rough proportionality challenge at the municipal level. The court dismissed the petition but proceeded to discuss the procedures and standards that would govern a rough proportionality challenge to the drainage fees if an appellate court concluded the challenge was preserved.

Both sides have appealed the judgment. Wolf Ranch contends it adequately preserved a rough proportionality challenge, and the district court erred by not requiring the City to justify its decision under the Act. The City's cross-appeal, in turn, contends the court erred by characterizing imposition of

drainage fees as the type of decision that could trigger the Act.

## II. Discussion

We must decide whether the City's imposition of drainage fees (or, more precisely, its refusal to exempt Wolf Ranch from those fees) impaired property rights in violation of the Act. The appeal and cross-appeal raise issues of statutory interpretation that we review de novo. *See Leyva v. People,* 184 P.3d 48, 50 (Colo.2008).

We hold there was no individualized exaction here that would require justification under the Act. Our reasoning on this point differs from that of the district court, which would have required the City to justify the fees under the Act had Wolf Ranch properly preserved the challenge. Nonetheless, because the court ultimately denied Wolf Ranch's petition, the City's cross-appeal arguably was unnecessary. *See Leverage Leasing Co. v. Smith,* 143 P.3d 1164, 1167–68 (Colo.App.2006) ("Without filing a cross-appeal, ... an appellee may raise any argument in support of the trial court's judgment, so long as the appellee does not seek to increase its rights under the judgment.") (citing *Farmers Group, Inc. v. Williams,* 805 P.2d 419 (Colo.1991)). Accordingly, for reasons different from those relied on by the district court, we affirm the judgment denying Wolf Ranch's petition.

## A. Background and Purposes of the Act

The Act was enacted in 1999 not just "to codify certain constitutionally-based standards that have been established and applied by the courts," § 29–20–201(3), C.R.S.2008, but also to "underscore[ ] and reinvigorate[ ]" federal and state constitutional protections against certain uncompensated takings. § 29–20–201(1)(c), C.R.S.2008. It was the culmination of several years of legislative efforts: prior versions of the Act passed the General Assembly in 1996 and 1997, but were vetoed by the governor. S. Journal, 61st Gen. Assemb., 1st Sess., at 1194–95 (Oct. 5, 1997 letter from Gov. Romer, vetoing S.B. 47).

The Act addresses regulatory takings like those in *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); and *Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). *See Krupp v. Breckenridge Sanitation Dist.,* 19 P.3d 687, 695 (Colo.2001); Greg Clifton, *Recent Developments in Regulatory Takings,* 28 Colo. Law. 83, 84–85 (Nov. 1999). *Nollan* and *Dolan* involved "exactions" of land—a beach access easement and a greenway, respectively—as conditions of zoning approvals. Such "development exactions will be deemed takings requiring just compensation unless they satisfy a two part test: (1) there must be an 'essential nexus' between the legitimate government interest and the exaction demanded; and (2) there must be 'rough proportionality' between the governmental interest and the required dedication." *Krupp,* 19 P.3d at 695 (citations to *Nollan* and *Dolan* omitted); *see also Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 546–48, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) (discussing *Nollan* and *Dolan* ).

### B. Language of the Act

The Act's substantive provisions—its "Conditions on land—use approvals"—are set forth in section 203. Subsection (1), the provision at issue here, provides:

> In imposing conditions upon the granting of land-use approvals, no local government shall require an owner of private property to dedicate real property to the public, or pay money or provide services to a public entity in an amount that is determined on an individual and discretionary basis, unless there is an essential nexus between the dedication or payment and a legitimate local government interest, and the dedication or payment is roughly proportional both in nature and extent to the impact of the proposed use or development of such property. This section shall not apply to any legislatively formulated assessment, fee, or charge that is imposed on a broad class of property owners by a local government.

§ 29–20–203(1), C.R.S.2008.

Under this statutory language, two threshold questions must be answered affirmatively

to trigger the Act: (1) was the action one "imposing conditions upon the granting of land-use approvals"?; and (2) did the local government "require an owner of private property to dedicate real property to the public, or pay money or provide services to a public entity in an amount that is determined on an individual and discretionary basis"? § 29–20–203(1). If the Act is triggered, the local government must justify the action under the "essential nexus" and "rough[ ] proportional[ity]" standards. *Id.* The standard of review is set forth in § 29–20–204(2)(c), C.R.S.2008: "[T]he burden shall be upon the local government to establish, based upon substantial evidence appearing in the record, that such dedication or payment is roughly proportional to the impact of the proposed use of the subject property." *See also* § 29–20–204(2)(b)(I)–(II), C.R.S.2008 (procedures for assembling and, if necessary, expanding record).

We need not answer the first question here. Specifically, we need not decide whether, in denying Wolf Ranch's request to be exempted from drainage fees, the City imposed conditions upon the granting of a land-use approval. Such conditions could be deemed to be imposed at one or more of three points: (1) when Cottonwood Creek basin fees first were established; (2) when the City Council declined to exempt Wolf Ranch from those previously established fees; or (3) when the City actually assesses those fees in connection with a final land-use approval. If point (1) were the only relevant imposition, then Wolf Ranch's challenge would be too late; if point (3) were the only relevant imposition, then Wolf Ranch's challenge would be too early. For purposes of this appeal, we will assume the City's refusal to exempt Wolf Ranch from drainage fees was a decision imposing conditions on a land-use approval.

We answer the second question in the negative. Specifically, we conclude the City's assessment of drainage basin fees is not the type of land-use condition that would trigger the Act so as to require individualized justification.

C. Analysis

▮ Not every condition on land use triggers the Act. Instead, the Act is triggered only by two types of conditions: (1) to "dedicate real property to the public"; or (2) to "pay money or provide services to a public entity in an amount that is determined on an individual and discretionary basis." § 29–20–203(1).

The first type of condition was imposed in *Nollan* and *Dolan,* and arguably is the only type that could give rise to a *constitutional* takings claim. *See Krupp,* 19 P.3d at 697–98 (case law "strongly indicate[s] that the *Nollan/Dolan* test is limited to exactions involving the dedication of property," except possibly for "a very narrow class of purely monetary exactions") (discussing *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999), and other cases). The City did not impose this type of condition.

The Act also covers some but not all types of monetary conditions: those payable to the public "in an amount that is determined on an individual and discretionary basis." § 29–20–203(1). The Act expressly "shall not apply. to any legislatively formulated assessment, fee, or charge that is imposed on a broad class of property owners by a local government." *Id.*

▮ The City, by denying the exemption request and conditioning any development on payment of drainage fees, did not impose the type of monetary condition covered by the Act. Drainage fees are determined under a formula set out in City ordinances, and are imposed by City Council resolutions for each individual basin. Here, the City has simply required Wolf Ranch to pay the same legislatively determined fee imposed on an equal per-acre basis on all developers in the Cottonwood Creek basin. This uniform fee was *not* "determined on an individual and discretionary basis," § 29–20–203(1). Rather, it was a "legislatively formulated assessment, fee, or charge that is imposed on a broad class of property owners by a local government," *id.*

▮ Wolf Ranch, in arguing that City officials exercise individual discretion to impose

fees, claims two other developers in two other basins were allowed to use "closed basin" development exempting them from drainage fees. The City responds these situations are distinguishable, because the decisions granting closed basin status were made at an earlier stage in the process before any meaningful development had occurred in the basins. We need not decide whether those other basin decisions are apposite; even if they were, they would not demonstrate the City is exercising the type of individualized fee-setting discretion that would trigger the Act.

The Act's applicability does not turn on whether there is administrative discretion to grant a fee exemption. Instead, it turns on whether the local government imposes the fee in "*an amount* that is determined on an individual and discretionary basis," § 29–20–203(1) (emphasis added). Here, the amount of the drainage fee is not determined on an individual and discretionary basis. Rather, the amount is determined formulaically under legislation applicable to "a broad class of property owners," *id.* Wolf Ranch is subject to the same per-acre fee that applies to all developers within the Cottonwood Creek basin.

Our textual conclusion that the City did not impose the type of individualized condition requiring justification under the rough proportionality test is confirmed by the Act's stated purposes. The Act is meant to protect against exactions requiring a landowner "to bear burdens for the public good that should more properly be borne by the public at large." § 29–20–201(2), C.R.S.2008. That, not coincidentally, is the same purpose animating constitutional protections. *See Dolan*, 512 U.S. at 384, 114 S.Ct. 2309 ("One of the principal purposes of the Takings Clause is to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.") (internal quotation marks omitted).

These purposes do not support applying the Act to the type of decision at issue here. Wolf Ranch is not being required to bear any disproportionate burden determined on an individual basis. To the contrary, it wants to be exempted from a legislatively determined fee imposed equally on all developers within the Cottonwood Creek basin. Exempting Wolf Ranch from this fee would not relieve it of a disproportionate burden but, by Wolf Ranch's own admission, would result in higher drainage fees for other developers within the basin. The City's decision not to exempt Wolf Ranch from this legislatively determined fee was not the type of exaction the General Assembly intended the Act to cover.

The supreme court's *Krupp* decision is also instructive as to the Act's reach and limits. *Krupp* is not dispositive because the underlying lawsuit there was filed before the Act's enactment, and the case directly involved only a constitutional takings claim under *Nollan* and *Dolan*. In dicta, however, the court noted that "Colorado's regulatory takings statute has codified the *Nollan/Dolan* test and, with it, the distinction between legislative and adjudicative determinations." 19 P.3d at 696 (citing § 29–20–203(1)). Accordingly, *Krupp* provides guidance as to the types of exactions covered by the Act, with the caveat that the Act applies to monetary and not simply property exactions.

*Krupp* rejected a takings challenge to a special sanitation district's assessment of a plant investment fee (PIF) on a builder. The PIF, which varied depending on the type of building being constructed, was determined according to a specified rate. In contrast, "*Nollan* and *Dolan* concerned discretionary adjudicative determinations specific to one landowner and one parcel of land." 19 P.3d at 695. Indeed, those cases "distinguished typical land use regulations" from "pointed exaction[s]" demanded as zoning conditions. *Id.* at 696. *Krupp* explained:

> One critical difference between a legislatively based fee and a specific, discretionary adjudicative determination is that the risk of leveraging or extortion on the part of the government is virtually nonexistent in a fee system. When a governmental entity assesses a generally applicable, legislatively based development fee, all similarly situated landowners are subject to the same fee schedule, and a specific landowner cannot be singled out for extraordinary concessions as a condition of development.

*Id.*

*Krupp* concluded the PIF was a "generally applicable service fee," and not a "pointed

exaction" imposed through a "discretionary adjudicative determination[ ]," even though it was determined by a district manager using a conversion schedule and "taking into account the legislative fee design." *See* 19 P.3d at 691–92. The court reasoned that "[n]either the promulgation of the conversion schedule, nor the calculation of the Krupps' PIF assessment by the assigned administrative official, constituted a discretionary adjudicative activity." *Id.* at 696. Accordingly, the PIF assessment was "different from the exactions subject to *Nollan* and *Dolan,* both in its creation and in its reach." *Id.*

Here, as in *Krupp,* the amount of the challenged fees was not established in a "discretionary adjudicative determination[ ] specific to one landowner and one parcel of land," 19 P.3d at 695. The fees were determined by City Council resolutions under a formula established in municipal ordinances. There is no risk Wolf Ranch is being "leverag[ed]," "extort[ed]," or "singled out for extraordinary concessions," *id.* at 696, because the drainage fees are not specific to one landowner and one parcel of land. Rather, municipal resolutions impose the fees on an equal per-acre basis on each developer within each particular drainage basin. And, given that the fees are set at the City Council level based on a stated formula, there is even less administrative discretion here than there was in *Krupp* to determine "the amount" of the fee.

### III. Conclusion

We hold the Act was not triggered because requiring Wolf Ranch to pay drainage fees did not impose a monetary condition in an amount determined on an individual and discretionary basis. The judgment dismissing Wolf Ranch's petition is affirmed.

Judge TAUBMAN and Judge CARPARELLI concur.