**WOLF RANCH, LLC, Petitioner**

v.

**The CITY OF COLORADO SPRINGS, Respondent.**

No. 08SC1073.

Supreme Court of Colorado, En Banc.

Dec. 14, 2009.

J. Gregory Walta, PC, J. Gregory Walta, Flynn Wright & Fredman, LLC, Bruce M. Wright, Colorado Springs, CO, Attorneys for Petitioner.

Colorado Municipal League, Erin E. Goff, Denver, CO, Attorney for Amicus Curiae Colorado Municipal League.

Colorado Springs City Attorney's Office, Patricia K. Kelly, City Attorney/Chief Legal Officer, William Bain, Senior City Attorney, Colorado Springs, CO, Attorneys for Respondent.

Justice RICE delivered the Opinion of the Court.

We review the opinion of the court of appeals in *Wolf Ranch, LLC v. City of Colorado Springs*, 207 P.3d 875, 877 (Colo.App. 2008) (selected for official publication), to address whether the court of appeal's judgment was in error.[1]

We hold that the court of appeals' conclusion was correct but for different reasons than those relied upon by that court. The court of appeals determined that the drainage fee at issue did not trigger the Regulatory Impairment of Property Rights Act ("RIPRA"), sections 29–20–201 to –205, C.R.S. (2009), because the amount of the fee was not determined on an individual or discretionary basis. We need not consider the merits of this interpretation, as we find that the drainage fee falls under the RIPRA's exception for "legislatively formulated [fees that are] imposed on a broad class of property owners." § 29–20–203(1), C.R.S. (2009). Therefore, we affirm the court of appeals' judgment with directions to remand to the district court for further proceedings consistent with this opinion.

## I. Facts and Procedural History

This case arises from the City of Colorado Springs' decision to impose a drainage fee as a condition to land use approvals connected with the development of real property known as Wolf Ranch. Petitioner Wolf Ranch, LLC ("Wolf Ranch") contends that Respondent the City of Colorado Springs ("Colorado Springs") violated RIPRA when it denied Wolf Ranch's request to exempt its property from the fee.

Wolf Ranch's property is part of approximately 10,000 acres annexed into Colorado Springs in 1982. The annexed area includes portions of three distinct drainage basins: the Pine Creek, Kettle Creek, and Cottonwood Creek Basins. The 1,900 acres belonging to Wolf Ranch are located within, and

---

1. We granted certiorari on the following question:
   Whether the court of appeals erred in ruling that the Regulatory Impairment of Property Rights Act, C.R.S. sections 29–20–201 to 205 is
   not applicable when a governmental body legislatively adopts a uniform fee, but then determines on an individual and discretionary basis whether or not to apply the fee to specific properties.

comprise a substantial portion of, the Cottonwood Creek Basin.

The Cottonwood Creek Basin is one of approximately thirty major drainage basins within Colorado Springs. Local ordinances require that the Colorado Springs City Council ("City Council") estimate drainage costs for each drainage basin and apportion those costs among all developers within that basin by collecting a uniform drainage fee.[2] A developer can offset its own drainage infrastructure costs against this fee.[3]

In 2005, Wolf Ranch applied to the City Drainage Board ("Drainage Board") for an exemption from the drainage fee set for the Cottonwood Creek Basin, then in the amount of $9,315 per acre.[4] In support of its application, Wolf Ranch proposed to develop 1,600 acres of its property as a "closed basin."[5] Developers of closed basins are exempt from drainage fees and, therefore, are not entitled to offset credits for their own drainage infrastructure costs. Of the three drainage basins located within the area annexed in 1982, the Pine Creek and Kettle Creek Basins were closed and thus exempted from drainage fees.[6]

At hearings before the Drainage Board, Wolf Ranch argued that it was entitled to an exemption based on language in the 1982 annexation agreement.[7] Wolf Ranch acknowledged that if it were allowed to develop its property as a closed basin, the drainage fees for other developers within the Cottonwood Creek Basin would increase by more than $5,000 per acre. At the conclusion of the hearing, the Drainage Board denied Wolf Ranch's request, finding the annexation agreement allowed Colorado Springs to impose the fees.[8] Wolf Ranch appealed to the

2. The drainage fee is established by resolution of the City Council on an annual basis. Colorado Springs, Colo., Code § 7.7.902 (2001). The exact amount of the fee is determined "within each drainage basin by dividing the number of acres within the drainage basin into the total cost [of drainage-related improvements]." *Id.*

3. *See* Colorado Springs, Colo., Code § 7.7.907 (2001) (enabling developers to offset drainage fees by the cost of drainage-related improvements).

4. The total amount of fees assessed to the Wolf Ranch property is estimated to be $14,904,000. However, with offsets from the cost of on-site detention to be constructed by the developers, the net fee Wolf Ranch would have to pay to Colorado Springs is estimated to be between $6,000,000 and $9,000,000.

5. Wolf Ranch does not own all of the Cottonwood Creek Basin in which its property is situated. Thus, its application is more accurately a request to close—and thus exempt from drainage fees—the portion of the basin it controls.

6. Colorado Springs closed the Pine Creek and Kettle Creek Basins in 1988 and 2002 respectively. In its briefs, Colorado Springs argued that each closed basin is uniquely situated. Nearly all of the developable property located in the Pine Creek Basin belongs to a single property owner, negating the need for a drainage fee scheme whose sole purpose is to share the cost of developing drainage infrastructure for the basin among multiple property owners. Only a small portion of the Kettle Creek Basin is located inside Colorado Springs' city limits, preventing Colorado Springs from implementing a comprehensive drainage fee scheme for that basin. Fi-

nally, the decision to close the Pine Creek and Kettle Creek Basins was made before development in either basin began, while development of the Cottonwood Creek Basin and the corresponding drainage fee scheme began immediately after annexation.

7. In pertinent part:

*Drainage.* Promptly after annexation, Briargate will prepare and submit to [Colorado Springs] an overall drainage concept for the Property. This will be a conceptual plan to determine whether drainage on the Property can be handled as an integrated basin without materially increasing historic off-site flows. If such an integrated basin approach is practicable, and [Colorado Springs] approves the overall drainage concept, then Owners, at their sole cost and expense and without any reimbursement, will provide drainage facilities in accordance with [Colorado Springs]approved drainage plans, and no portion of the Property will be subject to any [Colorado Springs] drainage fees. If such an integrated basin approach is not practicable for all or some of the Property, the property that an integrated basin approach cannot be applied to will be subject to [Colorado Springs'] drainage ordinances and policies. Colorado Springs, Colo., Annexation Agreement § 5.6 (1982).

8. The annexation agreement specifically provides that where, as here, "a [closed] basin approach is not practicable for all or some of the Property, the property that an integrated basin approach cannot be applied to will be subject to [Colorado Springs'] drainage ordinances and polices." § 5.6. In turn, the applicable ordinance grants the Drainage Board the authority to "administer

City Council. The City Council denied the appeal by a 4–3 vote.[9] Wolf Ranch then petitioned for relief in district court.

Before the district court, Wolf Ranch argued for the first time that RIPRA applied because Colorado Springs determined, on an individual and discretionary basis, that Wolf Ranch was not exempt from paying drainage fees. *See* § 29–20–203(1). It further argued that Colorado Springs could not show that its fees satisfied RIPRA's rough proportionality requirement. *See id.*[10]

The district court agreed that Colorado Springs' decision triggered RIPRA because it imposed a condition upon the granting of a land-use permit and assessed the fee in an amount determined on an individual and discretionary basis. *Id.* The district court found that Colorado Springs had the discretion to grant or deny Wolf Ranch's request. In addition, the district court reasoned that the annexation agreement contemplated that fee decisions would vary across the 10,000 acres of annexed property; thus, the fees were individualized. Accordingly, the district court held that Colorado Springs ordinarily would have to show that the fee was "roughly proportional" to Wolf Ranch's drainage impact. § 29–20–204, C.R.S. (2009).

But the district court denied Wolf Ranch's petition without addressing the proportionality of the fee. Because Wolf Ranch had not raised its RIPRA challenge before either the Drainage Board or the City Council, the

district court held that it could not present its challenge for the first time on "appeal."[11] However, in the event its decision was overturned, the district court outlined the standards and procedures that would govern a rough proportionality challenge to the drainage fee and noted its ability to hear additional evidence. *See* § 29–20–204(2)(b)(II) (stating that, in a rough proportionality challenge brought under RIPRA, "the court may order the parties to provide such additional facts and information as the court may deem appropriate.").

Both sides appealed. Wolf Ranch argued that it adequately preserved the rough proportionality challenge and that Colorado Springs was required to justify its fee decision. On cross-appeal, Colorado Springs responded that the district court erred by characterizing its decision as the type that would trigger RIPRA.

The court of appeals affirmed the district court's decision, albeit on different grounds. It found that RIPRA was not triggered because the *amount* of the drainage fee was not determined on an individual or discretionary basis, as the same per-acre fee applied to every non-exempt developer within the Cottonwood Creek Basin.

## II. Analysis

We turn now to the inquiry here presented: whether RIPRA[12] prohibits Colorado

---

the subdivision storm drainage funds." Colorado Springs, Colo., Code § 7.7.910(A).

9. The drainage ordinance further provides that "[d]ecisions of the Board may be appealed to the City Council ... and may be modified or reversed by the City Council for matters occurring within the jurisdiction of the City ...." § 7.7.910(C).

10. With respect to the rough proportionality requirement, Wolf Ranch stated that its plan called for the retention of drainage water on the property and that it would release water only at historic flow levels. Thus, its development would arguably have no impact on drainage for the other parcels of property located within the Cottonwood Drainage Basin. Further, the assessed fee at issue is based on existing infrastructure built elsewhere in the Cottonwood Creek Basin, and the fee's sole purpose is to provide reimbursement for the cost of that infrastruc-

ture's construction. Wolf Ranch argued that, because its drainage will occur on-site, it is not benefited from the existing drainage infrastructure.

11. Because it was being asked to review the decisions of the Drainage Board and City Council, the district court determined that Wolf Ranch's case before it was the equivalent of an appeal.

12. In pertinent part:

In imposing conditions upon the granting of land-use approvals, no local government shall require an owner of private property to dedicate real property to the public, or pay money or provide services to a public entity in an amount that is determined on an individual and discretionary basis, unless there is an essential nexus between the dedication or payment and a legitimate local government interest, and the dedication or payment is roughly

Springs from conditioning further development of Wolf Ranch's property on payment of approximately six to nine million dollars in drainage fees. We hold that the drainage fee at issue is a "legislatively formulated [fee] that is imposed on a broad class of property owners." § 29–20–203(1). As such, we find that Colorado Springs' decision to condition Wolf Ranch's land-use permit on the payment of drainage fees falls outside of RIPRA's ambit.

## A. Standard of Review

▮▮▮ Statutory interpretation is a question of law; therefore, our review of the court of appeals' judgment is de novo. *People v. Valenzuela*, 216 P.3d 588, 590 (Colo. 2009). Our analysis begins with the plain language of the statute. *Id.* If the statute at issue is "clear and unambiguous on its face," then we need look no further. *Id.* However, if the statutory language is ambiguous, we will turn to "the statute's legislative history, the consequences of a given construction, and the overall goal of the statutory scheme" to ensure proper interpretation of the statute. *Id.*

## B. Overview of RIPRA

In 1999, the Colorado General Assembly enacted RIPRA in order to "reinvigorate[ ] the federal constitutional prohibition against taking private property for public use without just compensation and the state constitutional prohibitions against taking or damaging private property for public or private use." § 29–20–201(1)(c); *see also* U.S. Const. amend. V; Colo. Const. art. II, § 15. Of course, it has long been our practice to enforce these constitutional safeguards and prevent government entities from "forcing some people alone to bear public burdens

which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); *Krupp v. Breckenridge Sanitation Dist.*, 19 P.3d 687, 695 (Colo.2001). Thus, we have held that RIPRA's practical effect was to codify the test for regulatory takings announced by the United States Supreme Court in *Nollan v. California Coastal Commission*, 483 U.S. 825, 836–37, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987),[13] and *Dolan v. City of Tigard*, 512 U.S. 374, 386–96, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).[14] *See Krupp*, 19 P.3d at 695.

▮▮▮ The Court's now familiar opinions established the presumption that a local government that conditions approval of a proposed development on an exaction of property effects a compensable taking. *Krupp*, 19 P.3d at 695. This presumption can be overcome only if the local government proves that (1) there is an "essential nexus" between the dedication or payment and a legitimate government interest, and (2) the dedication or payment is "roughly proportional" both in nature and extent to the impact of the proposed use or development of such property. *Id.* (summarizing the *Nollan/Dolan* test). Consequently, under RIPRA, a local government that requires a land owner to "dedicate real property to the public, or pay money or provide services to a public entity in an amount that is determined on an individual and discretionary basis" must first satisfy each prong of the *Nollan/Dolan* test. *See* § 29–20–203(1).

## C. Prior Holding in *Krupp*

We previously examined RIPRA in *Krupp v. Breckenridge Sanitation District*, 19 P.3d

---

proportional both in nature and extent to the impact of the proposed use or development of such property. This section shall not apply to any legislatively formulated assessment, fee, or charge that is imposed on a broad class of property owners by a local government.
§ 29–20–203(1).

13. *Nollan* considered whether a cognizable taking occurred when the California Coastal Commission demanded a lateral easement to the public beach directly behind a real property owner's

small vacation home in exchange for a building permit enabling the owner to raze the original structure and replace it with a new two-story home.

14. *Dolan* posed a similar question: whether the City of Tigard effected a taking when it granted a permit to a property owner to build a new hardware store and parking lot on the condition that the owner provide an easement over a portion of the property for public use as a greenway and bicycle path.

564

687, 695–97 (Colo.2001).[15] In that case, we considered whether a local government authority, the Breckenridge Sanitation District ("the District"), effected an unconstitutional taking when it granted a building permit to a pair of Summit County developers on the condition that they first pay a water plant investment fee. *Id.* at 689. We held that neither the fee nor the District's method of collecting it was subject to the *Nollan/Dolan* test. *Id.*

The District instituted the water plant investment fee so that the cost of expanding the existing wastewater treatment facilities could be apportioned among the developers responsible for increasing the overall amount of wastewater produced. *Id.* at 690–91. The District's regular practice was to collect the fee before issuing a building permit. *Id.* at 691. The amount of the fee was calculated according to a standard fee schedule established by the legislature and made available to the public. *Id.* at 690–91. Under the legislative scheme, property owners were charged a lower fee for year-round residences, including single-family homes and duplexes, and a higher fee for short-term rentals, including apartments and condominiums. *Id.* at 691. The legislature did not specifically assign triplexes to either category. *Id.*

The developers, Marshall and Renate Krupp ("the Krupps"), constructed a residential complex consisting of twenty-five units, themselves partitioned into three triplexes and eight duplexes. *Id.* Per usual, the District collected water plant investment fees from the Krupps when the building permit issued. *Id.* The District charged the Krupps the lower, residential rate for the eight duplexes. *Id.* Lacking an express legislative designation for triplexes, the District independently determined that the three triplexes were more likely to be used as short-term rentals and applied the higher rental rate. *Id.* Citing *Nollan* and *Dolan*, the Krupps argued that the District's decision to charge the higher rate for the triplexes constituted an unconstitutional taking. *Id.* at 691–92.

Our decision in *Krupp* examined the exception for legislatively formulated fees set forth in RIPRA. We determined that the exception was reasonable because legislatively formulated fees largely avoided the kind of regulatory pitfalls discussed in *Nollan* and *Dolan*. First, legislatively formulated fees would "insure that administrative action will be rational and consistent, and that subsequent judicial review of the action, if necessary, will be available and effective." *Krupp*, 19 P.3d at 694. Second, the risk of "leveraging or extortion" was "virtually nonexistent in a fee system" because "a generally applicable, legislatively based development fee [provides that] all similarly situated landowners are subject to the same fee schedule, and a specific landowner cannot be singled out for extraordinary concessions as a condition of development." *Id.* at 696.

With this in mind, we held that the District's water plant investment fee fell outside the narrow class of cases where the *Nollan/Dolan* test applied. *Id.* at 695 (defining the class as that where "a permitting authority, through a specific, discretionary adjudicative determination, conditions continued development on the exaction of private property for public use."). As further evidence that the fee did not constitute a discretionary adjudicative determination, we found that the fee was authorized by the General Assembly, was assessed according to a publicly promulgated fee schedule, and was applied to all new development governed by the District. *Id.* at 696. Therefore, "[n]either the promulgation of the [fee] schedule, nor the calculation of the Krupps' [water plant investment fee] by the assigned administrative official, constituted a discretionary adjudicative activity." *Id.*

### D. Applying RIPRA

■ As we previously stated in *Krupp*, the basic provisions of RIPRA are subject to one categorical exception. "[RIPRA] shall not apply to any legislatively formulated assessment, fee, or charge that is imposed on a broad class of property owners by a local government." § 29–20–203(1). It is upon this

15. The original dispute in *Krupp* arose before RIPRA was enacted in 1999. Therefore, while we examined RIPRA in our opinion, we did not specifically rely on it to reach our holding.

statutory language that we now turn our focus.

The RIPRA exception for legislatively formulated fees, like its two-prong test, owes its inception to *Nollan, Dolan,* and related case law.[16] The *Dolan* court found that the sort of land use regulations that have withstood constitutional challenge involved essentially legislative determinations classifying entire areas of a city, as opposed to the case before the Court which "made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel." *Dolan,* 512 U.S. at 385, 114 S.Ct. 2309. Thus, in *Krupp,* we distinguished between "generally applicable, legislatively formulated fees and adjudicatively imposed development exactions." *Krupp,* 19 P.3d at 696. In this respect, *Krupp* is entirely consistent with the case law of other states' high courts [17] as well as our own precedent.[18]

Of course, the difficulty lies not in creating these categories but in determining where, exactly, generally applicable, legislatively formulated fees end and adjudicatively imposed development exactions begin. Wolf Ranch invites us to find that, because Colorado Springs "singled out" Wolf Ranch by denying its request for exemption, Colorado Springs should be precluded from claiming that the drainage fee falls under the exception. We decline this invitation.

Both characteristics of a legislatively formulated fee that we identified in *Krupp* are evident in Colorado Springs' drainage fee system. The record clearly shows that the drainage fee has been assessed in a rational and consistent manner. Following the initial annexation of the Cottonwood Creek Basin in 1982, Colorado Springs determined that each of the estimated twenty-one property owners in the Cottonwood Creek Basin would be subject to a drainage fee. Since that time, every developer in the Cottonwood Creek Basin has been assessed an identical drainage fee.

That subsequent judicial review was available and effective is equally apparent. As was true of the District in *Krupp,* Colorado Springs provided Wolf Ranch the opportunity to appear before an administrative body and contest the manner in which the fees were administered.[19] Having found this decision unsatisfactory, Wolf Ranch, like the Krupps, availed itself of the state courts.[20]

Nor does the fact that Colorado Springs closed the Pine Creek and Kettle Creek Basins but refused to close the portion of Cottonwood Creek Basin owned by Wolf Ranch constitute an attempt by the city to single out Wolf Ranch for extraordinary concessions. The purpose of Colorado Springs' drainage fee system was (and remains) to share the cost of developing infrastructure for a particular drainage basin among the property owners located in that basin.[21] The

16. *See, e.g., Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) ("A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.") (internal citations omitted).

17. *See, e.g., Ehrlich v. City of Culver City,* 12 Cal.4th 854, 50 Cal.Rptr.2d 242, 911 P.2d 429, 447 (1996) ("[I]t is not at all clear that the rationale ... of *Nollan* and *Dolan* applies to cases in which the exaction takes the form of a *generally* applicable development fee or assessment—cases in which the courts have deferred to legislative and political processes ....").

18. *See, e.g., City of Littleton v. State,* 855 P.2d 448, 452 (Colo.1993); *Zelinger v. City & County of Denver,* 724 P.2d 1356, 1359 (Colo.1986).

19. In *Krupp,* this hearing took place before the District's Board of Directors, a body empowered

to grant or deny the Krupp's appeal. Here, Wolf Ranch had two opportunities to argue that its property should be considered a closed basin not subject to drainage fees—once before the Drainage Board and once before the City Council.

20. The Krupps initially won review by the district court by challenging the District's assessment of water plant investment fees as an arbitrary or illegal administrative action under C.R.C.P. 106(a)(4). Although it has not done so here, Wolf Ranch also could have sought further judicial review under C.R.C.P. 106(a)(4). Thus, in *Krupp* as here, subsequent judicial review would have been available and effective even without recourse to RIPRA.

21. Colorado Springs' drainage ordinance includes a statement of purpose:

The City Council further finds, determines and declares that it is necessary under all the attendant circumstances that the owner and developer of the subdivision shall provide the

annexation agreement expressly incorporates the existing drainage fee system;[22] thus, the exemption provision of the agreement must be read in a manner that is consistent with the local ordinances establishing that system.[23] Consequently, the appreciable "class" of property owners includes only those businesses and individuals who own property in the Cottonwood Creek Basin. Since the drainage fee was first instituted, Colorado Springs has, without exception, assessed a standard per-acre drainage fee against each property owner in the Cottonwood Creek Basin upon its application for a land-use permit. Thus, we find that Colorado Springs' decision to deny Wolf Ranch's request for an exemption was not an attempt to single out Wolf Ranch so that it must make extraordinary concessions as a condition of development.[24]

In *Krupp*, we held that the District's water plant investment fee fell outside the narrow class of cases "where a permitting authority, through a specific, discretionary adjudicative determination, conditions continued development on the exaction of private property for public use." *Id.* at 695. Because the facts here are largely analogous to those in *Krupp*, so too is our decision. Colorado Springs' drainage fee was authorized by the General Assembly,[25] publicly promulgated on a per-acre basis,[26] and equally applied to all new

development in the Cottonwood Creek Basin. Therefore, neither the promulgation of the drainage fee nor Colorado Springs' decision to deny Wolf Ranch's request for exemption from the fee constituted a discretionary adjudicative activity subject to RIPRA. *Id.*

### III. Conclusion

We hold that the drainage fee assessed to Wolf Ranch (and all owners of real property in the Cottonwood Creek Basin) by Colorado Springs falls under the exception for "legislatively formulated [fees that are] imposed on a broad class of property owners" under section 29–20–203(1). We therefore affirm the court of appeals' judgment with instructions to remand to the trial court for further proceedings consistent with this opinion.

Justice EID dissents, and Justice MARTINEZ joins in the dissent.

Justice EID, dissenting.

The Regulatory Impairment of Property Rights Act ("RIPRA") provides that in the land use approval process, "no local government shall require an owner of private property to … pay money or provide services to a public entity in an amount that is determined on an individual and discretionary basis," unless certain conditions are met. § 29–20–203(1), C.R.S. (2009). RIPRA

---

drainage facilities within his subdivision necessary for the drainage and control of surface water within his subdivision and also to provide the facilities required to convey such drainage waters to such outflow or discharge point as shall be indicated in the master drainage plan for *the drainage basin and area within which the subdivision is located.* Colorado Springs, Colo., Code § 7.7.901(B) (emphasis added).

**22.** Colorado Springs, Colo., Annexation Agreement § 5.6 (1982) ("the property … will be subject to [Colorado Springs'] drainage ordinances and policies").

**23.** While it is arguably unclear from the annexation agreement itself whether Colorado Springs may exempt property from drainage fees on a case-by-case or basin-by-basin basis, the language of the ordinances clearly favors the latter interpretation. *See, e.g.,* § 7.7.902 ("These studies [shall show all drainage facilities] required to provide for the drainage and stormwater quality control of surface waters *within the basins*";

"[t]he estimated cost per acre of providing the facilities shall be determined *within each drainage basin* by dividing the number of acres *within the drainage basin* into the total cost as provided"; "[i]f it is in *the best interest of the drainage basin* … a detention reservoir land fee may be established *for that basin*"; "the City Council shall establish by resolution the unit drainage fee and the unit detention reservoir land fee *in each drainage basin* to be effective January 1 of each year") (emphases added).

**24.** Indeed, were Colorado Springs to exempt Wolf Ranch from the fees, the remaining property owners in the Cottonwood Creek Basin could arguably claim that such decision would effectively demand such an extraordinary concession from them.

**25.** *See* § 29–20–104, C.R.S. (2009) (providing power and authority to local government to plan for and regulate land use in its respective jurisdiction).

**26.** *See* § 7.7.902.

makes clear, however, that its requirements do not apply "to any legislatively formulated assessment, fee, or charge that is imposed on a broad class of property owners by a local government." *Id.* The majority finds that the drainage fees imposed by the City of Colorado Springs ("Colorado Springs") on Wolf Ranch, LLC ("Wolf Ranch") fall within the "legislatively formulated assessment" exception because they are publicly promulgated and imposed on a standard per-acre fee basis on all property owners. Maj. op. at 566. Yet the fees imposed on Wolf Ranch were the product of the standard per-acre fee schedule *as modified by the Annexation Agreement* between the developers and Colorado Springs. That Annexation Agreement provides that Colorado Springs retains the discretion to impose the drainage fees on a particular property or exempt the property from payment, depending upon the circumstances. In other words, while the standard per-acre fee may, when considered in isolation, qualify as a "legislatively formulated assessment," that characterization is defeated by the discretionary, individualized regime adopted by the parties in the Annexation Agreement. Under the majority's interpretation, a local government satisfies the exception merely by publicly promulgating a uniform fee schedule, even though it has elsewhere retained the discretion to impose the fee on an individualized, case-by-case basis. In my view, the dictates of RIPRA cannot be so easily evaded. I therefore respectfully dissent from the majority's opinion.

The Annexation Agreement binds Colorado Springs and the property owners who own property within the 10,000–acre Briargate annexation area, including Wolf Ranch. That Agreement provides that as property is developed, property owners may apply to Colorado Springs for their property to be designated as being located in an "integrated," or closed, basin—that is, where drainage issues may be handled within the basin itself "without materially increasing historic off-site flows." Colorado Springs, Colo., Annexation Agreement § 5.6 (1982). If such designation is "practicable," the property owners then are responsible for building their own drainage facilities, "and no portion of the Property will be subject to any City drainage fees." *Id.* If such a designation is not practicable, "the property that an integrated basin approach cannot be applied to will be subject to the City's drainage ordinances and policies." *Id.* In other words, the Annexation Agreement provides that the standard per-acre drainage fee will be imposed on a particular property *only* if, under case-by-case consideration, that property cannot be deemed part of an integrated basin.

In this case, Wolf Ranch brought an action against Colorado Springs seeking to be declared part of an integrated basin and therefore exempt from drainage fees. Wolf Ranch's request was first considered by the City Drainage Board, which denied the request. Wolf Ranch then appealed the denial to the City Council, which held two hearings on the matter. Wolf Ranch argued that it had met the Annexation Agreement's criteria for integrated basin status (and an exemption from drainage fees) because, according to its expert, development of its property would have no drainage impact on downstream users. Certain members of the City Council took the position that Colorado Springs had the discretion to deny the exemption even where there was no downstream drainage impact, and expressed alternate grounds for imposition of the drainage fees on Wolf Ranch. For example, these council members believed that the fees could be imposed to mitigate general downstream drainage issues even where Wolf Ranch's development did not increase downstream drainage, and that the fees could be used to reimburse previous developers for drainage infrastructure they had made. Ultimately, the City Council voted 4–3 to deny Wolf Ranch's exemption request.

Setting the merits of Wolf Ranch's application for an exemption aside, the above-described process amply demonstrates that the drainage fees imposed in this case were determined on an "individual and discretionary basis" as those terms are used in RIPRA. *See* § 29–20–203(1) (act applies when fees are imposed in "an amount that is determined on an individual and discretionary basis"). Indeed, as the district court below observed, "*the parties agree* that Colorado Springs had

discretion to grant or deny the Wolf Ranch request for an exemption"—in fact, Colorado Springs argued that its discretion was so broad that "the exemption decision [was left to] its discretion *even when the qualifying criteria [i.e., no downstream impact] existed.*" *Wolf Ranch, LLC v. City of Colorado Springs,* No. 06CV4394, slip op. at 6–7, 2, (El Paso County Dist. Ct. Oct. 24, 2007) (Order and Judgment) (emphasis added). The district court further found that the fee determination had been made on an individualized, case-by-case basis, as contemplated in the Annexation Agreement. It noted that Colorado Springs had previously decided to exempt other parcels of property within the annexation area, including property located in the Kettle Creek and Pine Creek areas, and that the exemption determination was made specific to a particular property, rather than on a basin-wide basis.

The court of appeals reversed the district court's determination that the imposition of fees on Wolf Ranch was made on an individual and discretionary basis based on the language in RIPRA requiring that the "amount" of fees be determined on an individualized, discretionary basis. The court concluded that the fee determination was not individualized and discretionary because the "amount" of fees Wolf Ranch was required to pay was determined according to the standard drainage fee schedule. *Wolf Ranch, LLC v. City of Colorado Springs,* 207 P.3d 875, 881 (Colo. App.2008). I disagree with the court of appeals' interpretation and would reverse its ruling. In my view, the "amount" of fees imposed on Wolf Ranch was in fact determined on an individualized, discretionary basis because, based on the evidence regarding Wolf Ranch's particular property, Colorado Springs had the discretion to impose an amount of zero in drainage fees, or an amount according to the standardized fee schedule. The court of appeals' reasoning simply ignores the fact that Colorado Springs, under the Annexation Agreement,

had the discretion to impose zero drainage fees on a case-by-case basis.

The majority does not address the court of appeals' interpretation, stating that it "need not consider the merits of [the] interpretation," because it finds that Wolf Ranch's claim falls within RIPRA's "legislatively formulated assessment" exception. Maj. op. at 560. But the central issue of the case [27] cannot, in my view, be sidestepped in this manner. If a decision is made on an "individual and discretionary" basis, it is by definition not a "legislatively formulated assessment." The two concepts are simply two sides of the same coin. *See generally Krupp v. Breckenridge Sanitation Dist.,* 19 P.3d 687, 696 (Colo.2001) (a development fee is either a "generally applicable, legislatively formulated fee[ ]" or an "adjudicatively imposed development exaction[ ]" determined on an individual and discretionary basis); maj. op. at 565 (citing *Krupp,* 19 P.3d at 696). Thus, by deciding that the fee imposition in this case would fall within the "legislatively formulated assessment" exception, the majority finds that the fee was not imposed on an individual and discretionary basis—an interpretation that fails for the reasons described above.

While the majority attempts to avoid the court of appeals' reasoning that the determination here was not made on an "individual and discretionary" basis (as well as the district court's determination to the contrary), it makes the same error exhibited by the court of appeals. Both the court of appeals and the majority fail to take into account the individualized, discretionary regime put into place by the Annexation Agreement. The majority essentially concludes that because the Agreement incorporates the drainage fee system, the drainage fee system controls. Maj. op. at 566. Yet, as the district court properly concluded, the Annexation Agreement contains the very individualized, discretionary regime for determining drainage fee exemptions that was followed in this case. In my view, the drainage fee schedule lost its

27. We granted certiorari on the following issue: Whether the court of appeals erred in ruling that the Regulatory Impairment of Property Rights Act, C.R.S. sections 29–20–201 to 205 is not applicable when a governmental body legislatively adopts a uniform fee, but then determines on an individual and discretionary basis whether or not to apply the fee to specific properties.

character as a "legislatively formulated assessment" once Colorado Springs considered, on an individualized basis, whether it should impose the drainage fees on Wolf Ranch or exempt the property pursuant to the Annexation Agreement.

Under the majority's interpretation, a government entity is immune from RIPRA as long as it has put a standardized development fee on the books. Then, once the fee is in place, the government entity may retain the discretion to impose the fee by virtue of contract (as in this case), practice, or other means. In my view, the strictures of RIPRA cannot be evaded so easily. Instead, the determination of whether a fee is a "legislatively formulated assessment" requires an examination of the entire regime under which the fee is assessed—including, in this case, the discretion contained in the Annexation Agreement.

Although the majority cites a number of grounds in support of its interpretation, none of them is convincing. First, the majority relies heavily on our decision in *Krupp*, finding the facts in this case to be "largely analogous to those in *Krupp*." Maj. op. at 566. Yet there is a critical difference between this case and *Krupp*—namely that, unlike in this case, the government entity in *Krupp* did not retain by contract the discretion whether to impose the fee. *See Krupp*, 19 P.3d at 697.

Second, the majority places emphasis on the fact that Colorado Springs has imposed the drainage fee on all development in Cottonwood Creek, the basin in which the Wolf Ranch property is located. Maj. op. at 565–66. According to the majority, the fact that landowners in the Kettle Creek and Pine Creek Basins were exempted from paying the drainage fee is beside the point. *Id.* In my view, the appropriate comparison for determining whether the fee imposed is a "legislatively formulated assessment" in this case is the annexation area itself, which includes land located in all three basins. That is because the Annexation Agreement defines the area subject to the discretionary regime to include all three basins. As the district court concluded, Wolf Ranch was simply following the process that landowners in Kettle Creek and Pine Creek followed to obtain an exemption from the drainage fees.

But even if only the property located in Cottonwood Creek is used as a means of comparison, the result would be the same. Again, the Annexation Agreement itself provides that the drainage fees will be assessed on a discretionary basis. Simply because other landowners in the Cottonwood Creek Basin have been assessed the drainage fees does not change the character of the assessment from an individualized, discretionary determination to a generalized one. As the district court concluded, Colorado Springs has considered exemption requests on a case-by-case basis according to the particular land for which the exemption is sought. Thus, Colorado Springs' own practice contradicts its assertion that the fees have been imposed on a generalized basis.

The majority also emphasizes the fact that Wolf Ranch had plenty of opportunity to make its case—first before the Drainage Board, then before the City Council, and finally in court. Maj. op. at 565. Yet RIPRA guarantees more than simply an opportunity to be heard. It provides that "no local government shall require an owner of private property to … pay money or provide services to a public entity in an amount that is determined on an individual and discretionary basis," unless certain conditions are met. § 29–20–203(1). That the Drainage Board and the City Council gave Wolf Ranch's exemption request lengthy consideration merely reinforces the fact that it considered the request, pursuant to the Annexation Agreement, on an individualized, case-by-case basis.

Finally, the majority seems to stray into the merits of Wolf Ranch's claims. For example, it concludes that Colorado Springs' "decision to deny Wolf Ranch's request for an exemption was not an attempt to single out Wolf Ranch so that it must make extraordinary concessions as a condition of development." Maj. op. at 566; *see also id.* at 565 (same). Wolf Ranch, of course, disagrees with the majority's assessment of its argument on the merits, and argues that Colorado Springs denied its exemption because it had already exempted too much property

and needed to make up the fees from the only remaining undeveloped land—that is, Wolf Ranch. But the merits are simply not before us at this point. Rather, the issue is whether Wolf Ranch's claim, as a preliminary matter, falls within RIPRA's purview. On this issue, I would agree with the district court that the imposition of fees in this case was made on an individualized, discretionary basis, not as a "legislatively formulated assessment." I therefore would reverse the court of appeals' conclusion to the contrary, and remand the case to that court to consider Wolf Ranch's arguments on appeal challenging the district court's determination that its claim under RIPRA fails on the merits. Accordingly, I respectfully dissent from the majority's opinion.

I am authorized to say that Justice MARTINEZ joins in this dissent.